In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1687 & 10-2442

DONALD VANCE and NATHAN ERTEL,

*Plaintiffs-Appellees*,

*v.*

DONALD H. RUMSFELD and
THE UNITED STATES OF AMERICA,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6964—**Wayne R. Andersen**, *Judge*.

ARGUED FEBRUARY 10, 2011—DECIDED AUGUST 8, 2011
REARGUED EN BANC FEBRUARY 8, 2012—
DECIDED NOVEMBER 7, 2012

Before EASTERBROOK, *Chief Judge*, and POSNER, FLAUM, MANION, KANNE, ROVNER, WOOD, WILLIAMS, SYKES, TINDER, and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. This appeal presents the question whether the federal judiciary should create a right of action for damages against soldiers (and others

in the chain of command) who abusively interrogate or mistreat military prisoners, or fail to prevent improper detention and interrogation. Both other courts of appeals that have resolved this question have given a negative answer. *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012); *Doe v. Rumsfeld*, 683 F.3d 390 (D.C. Cir. 2012); *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011). Another circuit declined to create a damages remedy against intelligence officials who turned a suspected terrorist over to another nation for interrogation. *Arar v. Ashcroft*, 585 F.3d 559, 571–81 (2d Cir. 2009) (en banc). We agree with those decisions.

## I

In 2005 and 2006 Donald Vance and Nathan Ertel worked in Iraq for Shield Group Security (later known as National Shield Security), a private firm that provided protective services to businesses and governmental organizations. (This factual narration comes from the complaint, whose allegations we must accept for current purposes.) Vance came to suspect that Shield was supplying weapons to groups opposed to the United States. He reported his observations to the FBI. Ertel furnished some of the information that Vance relayed. Persons who Vance and Ertel suspected of gun-running retaliated by accusing Vance and Ertel of being arms dealers themselves. Military personnel arrested them in mid-April 2006. (The complaint does not specify which day the arrests occurred.)

According to the complaint, plaintiffs were held in solitary confinement and denied access to counsel. Their interrogators used "threats of violence and actual violence, sleep deprivation and alteration, extremes of temperature, extremes of sound, light manipulation, threats of indefinite detention, denial of food, denial of water, denial of needed medical care, yelling, prolonged solitary confinement, *incommunicado* detention, falsified allegations and other psychologically-disruptive and injurious techniques." Vance and Ertel were provisionally classified as "security internees" and called before a Detainee Status Board, but they were not allowed to present evidence—and the military officials running the proceedings refused to look at files on their computers that Vance and Ertel say would have established their innocence of arms-dealing charges. Nor did the Board contact the FBI, even though Vance and Ertel said that agents would verify their story.

The Board concluded on April 29, 2006, that Ertel should be released. Nonetheless he was held for another 18 days, during which interrogators continued to use harsh techniques. He was released on May 17, 2006. Vance remained in solitary confinement until his release on July 20, 2006, and was subjected to sleep deprivation, prolonged exposure to cold, intolerably loud music, "hooding," "walling" (placing a person's heels against a wall and slamming his body backward into that wall), threats of violence, and other techniques that caused physical or mental pain. The Army Field Manual forbids several of these techniques, which it classifies as "physical torture," "mental torture," or "coercion." See *Army Field*

*Manual: Intelligence Interrogation* 1–8 (1992). Whether any of the techniques constitutes "torture" within the meaning of 18 U.S.C. §2340(1), which makes torture by interrogators a crime, is a subject on which the parties' briefs do not join issue, and which we therefore do not address.

The Detainee Status Board eventually concluded that both Vance and Ertel are innocent of the allegations that had been made against them. Neither was charged with a crime.

In December 2006 Vance and Ertel filed this suit against persons who conducted or approved their detention and interrogation, and many others who had supervisory authority over those persons. The defendants included Secretary of Defense Donald Rumsfeld. Plaintiffs alleged that Secretary Rumsfeld had authorized the use of harsh interrogation methods in Iraq and contended that he is personally liable in damages—even though plaintiffs also alleged that they had never been accused of being enemy combatants and therefore were not within the scope of Secretary Rumsfeld's authorization. They also sued the United States, seeking the return of all property that had been seized from them in Iraq.

Rumsfeld asked the district court to dismiss the complaint, presenting three principal arguments: that federal law does not establish an action for damages on account of abusive military interrogation; that the complaint does not plausibly allege his personal involvement in plaintiffs' detention and interrogation; and that he is entitled to qualified immunity. The district court ruled

against all of these contentions. 694 F. Supp. 2d 957 (N.D. Ill. 2010). Rumsfeld has appealed under the doctrine of *Mitchell v. Forsyth*, 472 U.S. 511 (1985), which treats the rejection of an immunity defense as a final decision for the purpose of 28 U.S.C. §1291.

The United States also moved to dismiss the complaint, contending that the "military authority exception" to the Administrative Procedure Act, 5 U.S.C. §701(b)(1)(G), bars the suit against it. Section 701(b)(1)(G) prohibits judicial review of "military authority exercised in the field in time of war or in occupied territory". The district court concluded that this language does not apply—at least, does not prevent Vance and Ertel from engaging in discovery that they contend would show the statute's inapplicability—and denied the motion to dismiss. 2009 U.S. Dist. LEXIS 67349 (N.D. Ill. July 29, 2009). The district court later certified this order for interlocutory appeal under 28 U.S.C. §1292(b), see 2010 U.S. Dist. LEXIS 51973 (N.D. Ill. May 26, 2010), and a motions panel accepted the appeal.

A merits panel reversed the district court's decision with respect to the United States but affirmed with respect to Rumsfeld's claim of immunity. 653 F.3d 591 (7th Cir. 2011). We granted Rumsfeld's request for rehearing en banc and vacated the panel's opinion and judgment; this set aside both aspects of its decision.

## II

Both the district court and the panel concluded that it is appropriate to create a private right of action for dam-

ages against persons in the military chain of command. See generally *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The lead argument in former Secretary Rumsfeld's brief contests this conclusion. Because the basis of appellate jurisdiction is the district court's rejection of an immunity defense, however, we must consider whether we are authorized to address the merits.

The answer is yes. The Supreme Court held in *Siegert v. Gilley*, 500 U.S. 226, 232 (1991), that when evaluating an argument that a right is not "clearly established"—the essential ingredient in any invocation of qualified immunity—a court may conclude that the right has not been "clearly" established because it has not been established at all. The Court followed up in *Saucier v. Katz*, 533 U.S. 194 (2001), by holding that a court of appeals must decide both whether the right in question exists and whether its existence had been "clearly established" before the time of the challenged acts. *Pearson v. Callahan*, 555 U.S. 223 (2009), overruled that portion of *Saucier* and held that a court of appeals may use sound discretion when deciding whether to reach the merits ahead (or instead) of the immunity question. But the Court did not doubt that, on an interlocutory appeal under *Mitchell*, one potential ground of decision is a conclusion that the plaintiff does not have a legally sound claim for relief.

*Wilkie v. Robbins*, 551 U.S. 537, 548–50 (2007), applies this approach to *Bivens* claims in particular. Robbins sued some federal officials, asserting extra-statutory claims

for damages and contending that reasoning along the lines of *Bivens* allowed the federal judiciary to recognize such a remedy. Defendants took an interlocutory appeal, contending that they enjoyed qualified immunity. The Supreme Court ruled in defendants' favor—not because of immunity, but because it concluded that it should not create a new *Bivens* remedy. Similarly, in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court resolved a qualified-immunity appeal by deciding that the complaint did not state a plausible claim on the facts. We have jurisdiction to decide this case on the same grounds the Supreme Court employed in *Wilkie* and *Iqbal*. See also *Levin v. Madigan*, 692 F.3d 607, 610–11 (7th Cir. 2012).

The appeal by the United States does not present any jurisdictional problem, given the court's decision to accept the appeal certified under §1292(b). Neither does it present a difficult question. The panel held that §701(b)(1)(G) prevents any relief against the United States. 653 F.3d at 626–27. We agree with that conclusion, for the reasons the panel gave. Further discussion of the subject is unnecessary.

### III

When considering whether to create an extra-statutory right of action for damages against military personnel who mistreat detainees, we assume that at least some of the conditions to which plaintiffs were subjected violated their rights. Although the Constitution's application to interrogation outside the United States is not

settled, see *United States v. Verdugo-Urquidez*, 494 U.S. 259, 268–69 (1990), Rumsfeld concedes (for current purposes at least) that it governs. The conduct alleged in the complaint appears to violate the Detainee Treatment Act, 10 U.S.C. §801 note and 42 U.S.C. §§ 2000dd to 2000dd–1, and may violate one or more treaties. The source of the substantive right does not matter for the analysis that follows.

Unless there is a right of action against soldiers and their immediate commanders, however, there cannot be a right of action for damages against remote superiors such as former Secretary Rumsfeld. And neither the Detainee Treatment Act nor any other statute creates a private right of action for damages under the circumstances narrated by plaintiffs' complaint. This much, at least, is common ground among the parties. Plaintiffs therefore ask us to create a right of action under federal common law.

*Bivens* was the first time the Supreme Court created a non-statutory right of action for damages against federal employees. Since then the Court has created two others: for unconstitutional discrimination in public employment, see *Davis v. Passman*, 442 U.S. 228 (1979), and for violations of the eighth amendment by prison guards, see *Carlson v. Green*, 446 U.S. 14 (1980). It has not created another during the last 32 years—though it has reversed more than a dozen appellate decisions that had created new actions for damages. Whatever presumption in favor of a *Bivens*-like remedy may once have existed has long since been abrogated. The Supreme Court has

never created or even favorably mentioned the possibility of a non-statutory right of action for damages against military personnel, and it has twice held that it would be inappropriate to create such a claim for damages. See *Chappell v. Wallace*, 462 U.S. 296 (1983); *United States v. Stanley*, 483 U.S. 669 (1987). The Court has never created or even favorably mentioned a non-statutory right of action for damages on account of conduct that occurred outside the borders of the United States. Yet plaintiffs propose a novel damages remedy against military personnel who acted in a foreign nation—and in a combat zone, no less.

The Court's most recent decision declining to extend *Bivens* is *Minneci v. Pollard*, 132 S. Ct. 617 (2012). *Minneci* treated *Wilkie* as a restatement of the governing principles, 132 S. Ct. at 621. *Wilkie* tells us:

> our consideration of a *Bivens* request follows a familiar sequence, and on the assumption that a constitutionally recognized interest is adversely affected by the actions of federal employees, the decision whether to recognize a *Bivens* remedy may require two steps. In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. [*Bush v. Lucas*, 462 U.S. 367 (1983)] at 378. But even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: "the federal courts must make the kind of

> remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Bush*, *supra*, at 378.

551 U.S. at 550. Congress has provided some opportunities for compensation of persons injured by the military in combat zones. Rumsfeld does not contend that these statutes (which we discuss later) supply a "convincing reason for the Judicial Branch to refrain from creating a new and freestanding remedy in damages." But he does contend that many factors make it inappropriate for the judiciary to create a common-law remedy for damages arising from military operations in a foreign nation.

*Chappell* and *Stanley* hold that it is inappropriate for the judiciary to create a right of action that would permit a soldier to collect damages from a superior officer. Plaintiffs say that these decisions are irrelevant because they were not soldiers. That is not so clear. They were security contractors in a war zone, performing much the same role as soldiers. Some laws treat employees of military contractors in combat zones the same as soldiers. See, e.g., 18 U.S.C. §3261 and §3267(1)(A)(iii), parts of the Military Extraterritorial Jurisdiction Act discussed in *United States v. Brehm*, 691 F.3d 547 (4th Cir. 2012). See also *United States v. Ali*, 2012 CAAF Lexis 815 (C.A.A.F. July 18, 2012) (holding that a civilian employee of a security contractor in Iraq is treated as a soldier for the purpose of prosecution under the Uniform Code of Military Justice). But we need not decide whether civilians

doing security work in combat zones are soldiers by another name, because *Chappell* and *Stanley* did not entirely depend on the relation between the soldier and the superior officer.

The Supreme Court's principal point was that civilian courts should not interfere with the military chain of command—not, that is, without statutory authority. *Chappell* observed that military efficiency depends on a particular command structure, which civilian judges could mess up without appreciating what they were doing. 462 U.S. at 300. The Court observed that Congress has ample authority, under its constitutional power to "make Rules for the Government and Regulation of the land and naval Forces" (Art. I §8 cl. 14), to provide for awards of damages and other kinds of judicial review of military decisions. When Congress does not exercise that power—or when, as we explain in a moment, it exercises that power without providing for damages against military wrongdoers—the judiciary should leave the command structure alone. "Matters intimately related to . . . national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981).

Stanley tried to circumvent *Chappell* by suing some civilians and contending that the officers he had named were not his superiors but had been in a different branch of the military hierarchy. Stanley also observed that the plaintiff in *Chappell* had at least some monetary remedy through legislation, while he had none. The Court wrote in response: "The 'special facto[r]' that

'counsel[s] hesitation' [in creating a common-law remedy] is not the fact that Congress has chosen to afford some manner of relief in the particular case, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate." 483 U.S. at 683. That's equally true of our plaintiffs' situation. The fourth circuit addressed this subject in detail in *Lebron*, 670 F.3d at 548–52, and we agree with its evaluation.

What plaintiffs want is an award of damages premised on a view that the military command structure should be different—that, for example, the Secretary of Defense must do more (or do something different) to control misconduct by interrogators and other personnel on the scene in foreign nations. They want a judicial order that would make the Secretary of Defense care less about the Secretary's view of the best military policy, and more about the Secretary's regard for his own finances. Plaintiffs believe that giving the Secretary of Defense a financial stake in the conduct of interrogators would lead the Secretary to hold the rights of detainees in higher regard—which surely is true, but that change would come at an uncertain cost in national security.

If the judiciary never erred, damages awards against soldiers and their civilian supervisors would be all gain and no loss. But judges make mistakes: They may lack vital knowledge, may accept claims that should be rejected on the facts or the law, or may award excessive damages on justified claims or create supervisory liability when they shouldn't. See *Stanley*, 483 U.S. at

682–83; see also *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2087 (2011) (Kennedy, J., concurring). Accounting for human fallibility is an important part of the design of a legal system. Military prosecutors (or civilian prosecutors acting under the President's direction) can consider the needs of effective military action when exercising prosecutorial discretion. Judges lack information that executive officials possess, and in civil litigation there is no source of discretion comparable to a prosecutor's. The Justices concluded in *Chappell* and *Stanley* that Congress and the Commander-in-Chief (the President), rather than civilian judges, ought to make the essential tradeoffs, not only because the constitutional authority to do so rests with the political branches of government but also because that's where the expertise lies. That is as true here as it was in *Chappell* and *Stanley*. Accord, *Doe*, 683 F.3d at 394 ("Doe is a contractor and not an actual member of the military, but we see no way in which this affects the special factors analysis.").

The political branches have not been indifferent to detainees' interests. To the contrary, the treatment of military detainees has occasioned extended debate and led to a series of statutes. The Detainee Treatment Act is one. Others enacted or amended in the past decade include the Torture Victim Protection Act, 28 U.S.C. §1350 note; the Military Claims Act, 10 U.S.C. §2733; the Foreign Claims Act, 10 U.S.C. §2734; the Military Commissions Act, 10 U.S.C. §948a *et seq.*; the federal torture statute, 18 U.S.C. §§ 2340–2340A; the War Crimes Act, 18 U.S.C. §2441; and the Uniform Code of Military Justice, 10 U.S.C. §801 *et seq*. *Lebron* summarizes the ways

in which the political branches have addressed the appropriate design of policies about interrogation. 670 F.3d at 548–52. These statutes have one thing in common: *none* provides for damages against military personnel or their civilian superiors. Some, such as the Detainee Treatment Act, expressly block damages liability. (We return to this shortly.) Others provide compensation to victims of military errors or misconduct, but the compensation comes from the public fisc rather than private pockets.

For example, the Military Claims Act provides that the Judge Advocate General of each service may award up to $100,000 from the Treasury to any person injured by the military. The Foreign Claims Act provides that a claims commission may award up to $100,000 of public money to a person injured by the U.S. military in a foreign nation. (These options are mutually exclusive; when the Foreign Claims Act or the Federal Tort Claims Act applies, the Military Claims Act does not. See 10 U.S.C. §2733(b)(2).) We asked plaintiffs' counsel at oral argument whether they had applied for awards under either statute. Counsel said no, telling us that $100,000 is too little for their injuries and that the persons charged with implementing these laws enjoy too much discretion for plaintiffs' liking. (Plaintiffs have not argued that 32 C.F.R. §536.45(h), which provides that the military will not make awards under either statute for assault and battery, would make these statutes useless to them. Section 536l.46(h) allows awards for intentional torts related to an investigation; because the briefs do not discuss the effect of §536.45(h), we do not consider

whether plaintiffs' losses would come within the "investigation" clause.)

We are willing to assume that the cap on awards, and the existence of discretion about when to award compensation (and how much to provide), means that these statutes are not full substitutes for a *Bivens* remedy. See *Minneci*, the Court's most recent discussion of that subject. Still, the fact that Congress has provided for compensation tells us that it has considered how best to address the fact that the military can injure persons by improper conduct. We take two things from the Military Claims Act and the Foreign Claims Act: first, Congress has decided that compensation should come from the Treasury rather than from the pockets of federal employees; second, plaintiffs do not need a common-law damages remedy in order to achieve some recompense for wrongs done them. Unlike Webster Bivens, they are not without recourse.

Vance and Ertel maintain, however, that through the Detainee Treatment Act Congress has decided that they *are* entitled to damages from the Secretary of Defense and his subordinates. A portion of the Detainee Treatment Act codified at 42 U.S.C. §2000dd–1(a) provides that in both civil suits and criminal prosecutions, military interrogators and their superiors are protected from liability if "such officer, employee, member of the Armed Forces, or other agent did not know that the practices were unlawful and a person of ordinary sense and understanding would not know the practices were unlawful. Good faith reliance on advice of counsel should be an

important factor, among others, to consider in assessing whether a person of ordinary sense and understanding would have known the practices to be unlawful."

Of course a *defense* to damages liability does not *create* damages liability, but plaintiffs contend that §2000dd–1(a) assumes that this liability already exists, so personal liability must have Congress's blessing. That assumption is unwarranted. Congress often legislates to make doubly sure that federal employees will not be personally liable. The Westfall Act, 28 U.S.C. §2679, is an example of that strategy. (*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995), and *Ali v. Rumsfeld*, *supra*, discuss that law's scope and effects.) The Public Health Service Act, 42 U.S.C. §233(a), is another. See *Hui v. Castaneda*, 130 S. Ct. 1845 (2010). Section 7(a) of the Military Commissions Act, 28 U.S.C. §2241(e)(2), is a third. It forbids awards of damages to aliens detained as enemy combatants. See *Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012). The existence of safeguards against personal liability does not imply legislative authorization for the judiciary to create personal liability.

Section 2000dd–1(a) applies only to suits by aliens and therefore does not affect suits by citizens such as plaintiffs. Plaintiffs treat the restricted coverage of §2000dd–1 as a glitch, but we think it is more likely that the coverage reflects an assumption behind the statute. Aliens detained by U.S. military personnel might invoke multiple sources of authorization to award damages: one is the Torture Victim Protection Act; a second is the Alien Tort Act, 28 U.S.C. §1350; and the third is the

law of the nation in which the detention occurred (here, the law of Iraq). Congress may have wanted to make sure that military personnel enjoy some protection against suits by persons who have an express right of action. Vance and Ertel cannot use (at least, have not tried to use) the Torture Victim Protection Act, the Alien Tort Act, or the law of Iraq as a basis for the remedy they seek. That Congress has put an obstacle in the way of persons who could use those bodies of law does not imply that persons who cannot use them must have a common-law damages remedy.

The Detainee Treatment Act can be—and has been—enforced by criminal prosecutions. The Department of Defense has procedures for reporting claims of abuse; these procedures require all reports to be investigated and require prosecution to follow substantiated reports. See Army Regulation 190–8 at §§ 1–5, 3–16, 6–9; DoD Directives 5100.77, 2311.01E. Failure by military personnel to follow these procedures is a court-martial offense. 10 U.S.C. §892. Abusive interrogation in Iraq and Afghanistan has led to courts-martial. Injunctions that enforce the Detainee Treatment Act prospectively may be possible under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), or the waiver of sovereign immunity in 5 U.S.C. §702. But Congress has not authorized awards of damages against soldiers and their superiors, and creating a right of action in common-law fashion would intrude inappropriately into the military command structure.

A *Bivens*-like remedy could cause other problems, including diverting Cabinet officers' time from manage-

ment of public affairs to the defense of their bank accounts. See *Doe*, 683 F.3d at 396. Then there are problems with evidence. See *Lebron*, 670 F.3d at 555–56. When the state-secrets privilege did not block the claim, a court would find it challenging to prevent the disclosure of secret information. Anyone, whether or not a *bona fide* victim of military misconduct, could sue and then use graymail (the threat of disclosing secrets) to extract an undeserved settlement. See *Arar*, 585 F.3d at 578–81. That's not a problem under the Military Claims Act and the Foreign Claims Act, which allow proceedings to be conducted in confidence.

The panel distinguished *Arar* and *Ali v. Rumsfeld* on the ground that those plaintiffs were aliens (Arar, for example, is a citizen of Canada). 653 F.3d at 620–22. More recent decisions, including *Lebron* and *Doe*, dealt with (and rejected) *Bivens*-like claims by U.S. citizens. We do not think that the plaintiffs' citizenship is dispositive one way or the other. See *Doe*, 683 F.3d at 396. Wallace and Stanley also were U.S. citizens. The Supreme Court has never suggested that citizenship matters to a claim under *Bivens*. It would be offensive to our allies, and it should be offensive to our own principles of equal treatment, to declare that this nation systematically favors U.S. citizens over Canadians, British, Iraqis, and our other allies when redressing injuries caused by our military or intelligence operations. Treaties may pose a further obstacle to favoring U.S. citizens in the design of common-law remedies, but we need not decide, because the choice of remedies for military misconduct belongs to Congress and the President rather than the judicial branch.

**IV**

Even if we were to create a common-law damages remedy against military personnel and their civilian superiors, former Secretary Rumsfeld could not be held liable. He did not arrest plaintiffs, hold them incommunicado, refuse to speak with the FBI, subject them to loud noises, threaten them while they wore hoods, and so on. The most one could say about him—the most plaintiffs *do* say about him—is that (a) in 2002 and 2003 he authorized the use of harsh interrogation techniques when dealing with enemy combatants, (b) he received reports that his subordinates sometimes used these techniques, without authorization, on persons such as plaintiffs despite the Detainee Treatment Act of 2005, and (c) he did not do enough to bring interrogators under control.

The Supreme Court held in *Iqbal* that liability under a *Bivens*-like remedy is personal. 556 U.S. at 676–77. Cabinet secretaries (in *Iqbal* the Attorney General) and other supervisory personnel are accountable for what they do, but they are not vicariously liable for what their subordinates do. The Court added that knowledge of a subordinate's misconduct is not enough for liability. The supervisor can be liable only if he wants the unconstitutional or illegal conduct to occur. *Id*. at 677. Yet plaintiffs do not allege that Secretary Rumsfeld *wanted* them to be mistreated in Iraq. His orders concerning interrogation techniques concerned combatants and terrorists, not civilian contractors. What happened to plaintiffs violated both Rumsfeld's directives of 2002

and 2003, and the Detainee Treatment Act of 2005. In an ideal world, the Secretary of Defense and the Army's Chief of Staff would have achieved full compliance with the Detainee Treatment Act, but a public official's inability to ensure that all subordinate federal employees follow the law has never justified personal liability.

The gist of plaintiffs' claim against Rumsfeld is that harsh interrogation tactics were used erroneously, pointlessly, and excessively in their situation. Plaintiffs should be compensated, if their allegations are true—though it is too late for them to invoke the Foreign Claims Act, which has a two-year period of limitations. Just because it may be hard to use the statutory mechanisms of compensation, however, it does not follow that a Cabinet official must pay out of his own pocket. To see this, ignore for the moment the military and foreign-location issues and ask whether persons in the United States who are shot by federal agents or beaten by prison guards have a good claim against the Director of the FBI, the Director of the Bureau of Prisons, or the Attorney General. They do not. Both *Iqbal* and *al-Kidd* say that supervisors are not vicariously liable for their subordinates' transgressions.

The Director of the FBI allows field agents to carry guns and permits them to use deadly force. Yet if an agent shoots a fleeing suspect in the back, violating the fourth amendment, see *Tennessee v. Garner*, 471 U.S. 1 (1985), the Director is not liable just because the gun, issued under the Director's policy, was a cause of the injury. Similarly for a police chief who establishes a K-9 squad,

if a dog bites a bystander, or who authorizes search or arrest based on probable cause, if the police then search or arrest *without* probable cause.

Plaintiffs' theme is that Secretary Rumsfeld, having authorized harsh interrogation tactics for enemy combatants in 2002 and 2003, should have intervened after receiving reports that non-combatants were being subjected to these tactics and that interrogators had not properly implemented the Detainee Treatment Act of 2005. Yet the standard form of intervention would have been criminal prosecution (in the civilian courts or by court-martial). The Department of Defense did prosecute some soldiers through courts-martial, and the Department of Justice filed some criminal prosecutions. Plaintiffs think that they should have done more, but no one can demand that someone else be prosecuted. See, e.g., *Castle Rock v. Gonzales*, 545 U.S. 748 (2005); *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189 (1989); *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973). A court cannot say that, if there are too few prosecutions (or other enforcement), and thus too much crime, then the Attorney General or the Secretary of Defense is personally liable to victims of (preventable) crime. Yet that's what plaintiffs' approach entails.

*Iqbal* held that knowledge of subordinates' misconduct is not enough for liability. The supervisor must want the forbidden outcome to occur. Deliberate indifference to a known risk is a form of intent. But *Farmer v. Brennan*, 511 U.S. 825 (1994), holds that, to show *scienter* by the deliberate-indifference route, a plaintiff must demon-

strate that the public official knew of risks with sufficient specificity to allow an inference that inaction is designed to produce or allow harm. A warden's knowledge that violence occurs frequently in prison does not make the warden personally liable for all injuries. See *McGill v. Duckworth*, 944 F.2d 344 (7th Cir. 1991). Prisons are dangerous places, and misconduct by both prisoners and guards is common. Liability for wardens would be purely vicarious. *Farmer* rejected a contention that wardens (or guards) can be liable just because they know that violence occurs in prisons and don't do more to prevent it on an institution-wide basis. To get anywhere, Vance and Ertel would need to allege that Rumsfeld knew of a substantial risk to security contractors' employees, and ignored that risk because he wanted plaintiffs (or similarly situated persons) to be harmed. The complaint does not contain such an allegation and could not plausibly do so.

The head of *any* large bureaucracy receives reports of misconduct. The Secretary of Defense has more than a million soldiers under his command. The Attorney General supervises thousands of FBI and DEA agents, thousands of prison guards, and so on. Many exceed their authority. People able to exert domination over others often abuse that power; it is a part of human nature that is very difficult to control. See Philip Zimbardo, *The Lucifer Effect: Understanding How Good People Turn Evil* (2007). The head of an organization knows this, or should know it. Every police chief knows that some officers shoot unnecessarily or arrest some suspects without probable cause, and that others actually go over to the criminal

side and protect drug rackets. But heads of organizations have never been held liable on the theory that they did not do enough to combat subordinates' misconduct, and the Supreme Court made it clear in *Iqbal* that such theories of liability are unavailing.

Plaintiffs do not cite even one instance in which an Attorney General, a Director of the FBI, a Director of the Bureau of Prisons, or a municipal chief of police has been held personally liable for not ensuring that subordinates respect prisoners' or suspects' rights. Claims against the Secretary of Defense, who has more people under his command, and a longer chain of subordinates between him and the culpable soldiers, are weaker.

Although Vance and Ertel contend that their injuries can be traced (remotely) to Secretary Rumsfeld's policies of 2002 and 2003, as well as to the misconduct of personnel in Iraq, they do not contend that the policies authorized harsh interrogation of security detainees, as opposed to enemy combatants. It is therefore unnecessary to decide when, if ever, a Cabinet officer could be personally liable for damages caused by the proper application of an unlawful policy or regulation. As we observed in *Hammer v. Ashcroft*, 570 F.3d 798, 800 (7th Cir. 2009) (en banc), the normal means to handle defective policies and regulations is a suit under the Administrative Procedure Act or an equivalent statute, not an award of damages against the policy's author. Accord, *Arar*, 585 F.3d at 572–73. No court has ever held the Administrator of the EPA personally liable for promulgating an invalid regulation, even if that regulation

imposes billions of dollars in unjustified costs before being set aside. Cf. *Padilla v. Yoo*, 678 F.3d 748 (9th Cir. 2012) (Deputy Assistant Attorney General not personally liable for preparing an opinion concluding that Secretary Rumsfeld's policies were valid). The extent to which untenable directives, policies, and regulations may support awards of damages can safely be postponed to another day.

V

Because we have held that a common-law right of action for damages should not be created—and that plaintiffs' complaint would fail to state a claim against former Secretary Rumsfeld even if such a right of action were to be created—it is unnecessary to decide whether Rumsfeld violated plaintiffs' clearly established rights. The decisions of the district court are reversed.

WOOD, *Circuit Judge*, concurring in the judgment. Civilized societies do not condone torture committed by governmental agents, no matter what job title the agent holds. I am confident that every member of this court

would agree with that proposition. This is therefore a case of system failure: plaintiffs Donald Vance and Nathan Ertel assert that representatives of the U.S. government (who happened to be members of the Armed Forces) subjected them to a variety of measures that easily qualify as "torture," whether under the definitions found in the *Army Field Manual*, international law, or legislation such as the Torture Victim Protection Act, 28 U.S.C. § 1350 note, § 3(b). This shameful fact should not be minimized by using euphemisms such as the term "harsh interrogation techniques." The question before us is whether the man who served as Secretary of Defense at the time of the plaintiffs' ordeal, Donald Rumsfeld, is entitled to qualified immunity in the suit they have brought against him. Although I part company in substantial ways from the majority's reasoning, I conclude that former Secretary Rumsfeld himself is entitled to such immunity. The same may well be true of others who had no personal participation in these events. Nevertheless, I am in substantial agreement with Judge Hamilton's dissenting opinion when it comes to the question of possible liability for those who actually committed these heinous acts. I therefore am able only to concur in the court's judgment.

# I

The majority's account in Part I of the underlying facts, which it properly presents in the light most favorable to Vance and Ertel, provides the essential information for deciding the case. But I find its charac-

terization of the facts to be incomplete in one important respect. In my view, "threats of violence and actual violence, sleep deprivation and alteration, extremes of temperature, extremes of sound, light manipulation, threats of indefinite detention, denial of food, denial of water, denial of needed medical care, yelling, prolonged solitary confinement, *incommunicado* detention, falsified allegations," as well as "prolonged exposure to cold, intolerably loud music, 'hooding,' 'walling,'" and the like, must be acknowledged for what they are: torture. *Ante* at 3. In other cases, we might need to draw a line between harsh techniques and actual torture, but that is not a problem here. It is notable that courts have found that comparable actions also violate the Eighth Amendment to the U.S. Constitution, for prisoners, or the Due Process Clauses, in the case of pretrial detainees and others not facing punishment. See, *e.g.*, *Wilson v. Seiter,* 501 U.S. 294, 304 (1991) (holding that conditions of confinement may establish an Eighth Amendment violation in combination, even if each would not suffice alone; this would occur when they have "a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise"); *DeSpain v. Uphoff,* 264 F.3d 965, 974 (10th Cir. 2001) (concluding that exposure to human waste for 36 hours would constitute a deprivation serious enough to violate the Eighth Amendment).

Like the majority, I conclude that we are authorized in this appeal to consider the question whether the plaintiffs have stated a claim against the Secretary. I have nothing to add to its analysis in Part II of its opinion. In

particular, I agree with the majority that the panel correctly ruled that 5 U.S.C. § 701(b)(1)(G) forecloses plaintiffs' claims against the United States. I therefore proceed directly to explain my disagreement with Part III of the majority's opinion, and my agreement with the ultimate conclusion of Part IV (and thus with the ultimate decision to reverse the judgment of the district court).

## II

In Part III of its opinion, the majority tackles the broad question "whether to create an extra-statutory right of action for damages against military personnel who mistreat detainees." *Ante* at 7. Almost every part of this phrasing of the issue needs closer examination. Although a literal sense, the cause of action recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), might be called "extra-statutory," that does not mean that the claim sprang forth from the heads of federal judges. It was solidly rooted in the most fundamental source of law we have, the Constitution, and in particular the Fourth Amendment. The lawsuit fell comfortably within the boundaries of the federal-question jurisdiction Congress has conferred in 28 U.S.C. § 1331. To expand Vance's and Ertel's case to one that involves any and all possible claims against military personnel is, as Judge Hamilton has persuasively shown, neither necessary nor wise. Had Vance and Ertel known from the start the identity of their tormenters, and had they sued

only those people, we might have a very different reaction to the issues presented. I consider it premature at best to assume that a civilian in the state of Texas who is dragged by a military officer onto the grounds of Fort Hood and then tortured would not have a *Bivens* cause of action against that officer. Although the majority stresses that the events in our case occurred in a "combat zone," even that is not entirely accurate. In fact, plaintiffs were removed from the active combat zone and placed into a military prison—critically, a place where there was plenty of time to make considered decisions and enemy forces were nowhere to be seen. Finally, the phrase "mistreat detainees" wrongly implies possible liability for a broader range of injury than the plaintiffs are asserting (or at least than I would be prepared to recognize). More than simple mistreatment is at stake here. We are talking about conduct that the international community recognizes as torture and that lies at the extreme end of that which would support a finding of Eighth Amendment liability in a suit brought by a domestic prisoner.

Rather than starting—and ending—with Secretary Rumsfeld, the majority inexplicably starts at the bottom of the military hierarchy. It makes the obvious point that if the lowest private and her immediate commanders have done nothing wrong, then the lieutenants, captains, colonels, generals above her, including ultimately the Secretary of Defense, would similarly have no liability for that private's actions. But why start there? It is a fallacy to think that the converse of this is true: that just because the Secretary has done nothing wrong,

then none of the people inferior to him can have erred. The majority acknowledges just this point in Part IV of its opinion, *ante* at 21-22. Cases are legion where a warden is exonerated even though prison guards are liable; where a school superintendent has no liability even though a principal does. See, *e.g.*, *Lojuk v. Quandt*, 706 F.2d 1456 (7th Cir. 1983) (Veterans Administration staff psychiatrist may be liable for performing electro-shock therapy on patient without consent, but supervisor is not); *Lenz v. Wade*, 490 F.3d 991 (8th Cir. 2007) (officers liable for beating inmate, but warden is not); *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001) (principal and teacher liable for teacher's sexual abuse of student, but superintendent and personnel director are not).

The majority has written with a broad brush with respect to those lower down in the chain of responsibility, and it does not seem to have drawn any distinction between the obviously culpable actors and those whose involvement may have been more indirect. But perhaps it has: in the end I cannot tell whether the majority intends to preclude *Bivens* liability even for the direct actors. Either way, I find the gist of the majority's discussion troubling. The Court has seen many cases raising questions about abusive police, military, or prison guard tactics. In the police and prison contexts, the Court has affirmatively recognized the availability of *Bivens* actions. See *Bivens; Carlson v. Green*, 446 U.S. 14, 19 (1980). And the majority passes over without comment the *Bivens* cases that have come before the Court at the *certiorari* stage over the years. Although we all know that a denial of *certiorari* in itself does not convey any

message—either approval or disapproval—we know
equally well that the Court does not hesitate to step in
and correct lower courts that have strayed beyond
the boundaries it has established. It has done just this
in case after case in the *habeas corpus* area. See *Overstreet
v. Wilson*, 686 F.3d 404, 410-11 (7th Cir. 2012) (Wood, J.,
dissenting) (listing cases reversing grants of *habeas
corpus* relief and noting the use of summary reversals
in this area). The Court has not sent such clear signals
in the *Bivens* Eighth Amendment context, even as it has
issued decisions such as *Minneci v. Pollard,* 132 S. Ct. 617
(2012), which declined to make a *Bivens* remedy avail-
able against employees of a *private* prison facility. Had
the Court wished to disapprove *Bivens* actions altogether,
it would not have taken the trouble in *Minneci* to
review the history of *Bivens* and decide on which side
of the line the proposed claim fell.

The Court's acceptance of *Bivens* in the closely
related area of the Eighth Amendment is consistent
with both Congress's actions and the position of the
Executive Branch. The majority brushes over the fact
that the Detainee Treatment Act expressly provides a
defense to a civil action brought against a member of
the Armed Forces or any other agent of the U.S. gov-
ernment for engaging in practices prohibited by that
law. What suit? Congress can have been referring only
to a *Bivens* action. It did much the same thing when
it passed the Westfall Act of 1988, which went out of
its way to state that the substitution of the United States
for a federal employee for purposes of the Federal Tort
Claims Act "does not extend or apply to a civil action

against an employee of the Government . . . which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). Although it is theoretically possible that Congress was just underscoring its understanding that no such suit was possible, that is a strained reading of the statutory language, and it is a reading that some scholars have rejected. See James E. Pfander and David Baltmanis, *Rethinking Bivens: Legitimacy and Constitutional Adjudication,* 98 Georgetown L. J. 117, 132-38 (2009) (arguing that Congress "joined the Court as a partner in recognizing remedies in the nature of a *Bivens* action [based on] the Westfall Act's preservation of suits for violation of the Constitution and [on] the considerations that led to its adoption.").

Moreover, as Judge Hamilton notes, the State Department relied on the availability of *Bivens* actions when it filed answers to a number of questions posed by the United Nations committee with oversight responsibility over the Convention Against Torture (CAT). Question 5 pointed out that the United States had taken the position that the CAT was not self-executing, and it asked for a specification of how the United States proposed to meet its obligations under the Convention. The State Department provided a lengthy response, which in relevant part read as follows:

> Finally, U.S. law provides various avenues for seeking redress, including financial compensation, in cases of torture and other violations of constitutional and statutory rights relevant to the Convention. Besides the general rights of appeal,

these can include any of the following, depending on the location of the conduct, the actor, and other circumstances:

\* \* \*

• Bringing a civil action in federal or state court under the federal civil rights statute, 42 U.S.C. § 1983, directly against state or local officials for money damages or injunctive relief;

• Seeking damages for negligence of federal officials and for negligence and intentional torts of federal law enforcement officers under the Federal Tort Claims Act, 22 U.S.C. § 2671 *et seq.*, or of other state and municipal officials under comparable state statutes;

• Suing federal officials directly for damages under provisions of the U.S. Constitution for "constitutional torts," see *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and *Davis v. Passman*, 442 U.S. 228 (1979);

\* \* \*

See United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (Apr. 28, 2006) (Question 5), available at http://www.state.gov/g/drl/rls/68554.htm (last visited Oct. 30, 2012). I do not know whether the State Department will feel compelled to inform the Committee that it was in error with respect to its *Bivens/Davis* representation in light of the majority's opinion, but there is no ambiguity in what it said.

The last point the majority makes in Part III is that, in their view, the plaintiffs' citizenship should not be dispositive either way. If we were writing on a clean slate, then I would enthusiastically endorse that sentiment. The problem is that the background statutes—not to mention international law—are replete with distinctions based on citizenship. Thus, the Torture Victim Protection Act, 28 U.S.C. § 1350 note, provides a remedy to any "individual," but only against "[a]n individual" who acts "under actual or apparent authority, or color of law, of any foreign nation." *Id.*, § 2(a). The Alien Tort Statute, 28 U.S.C. § 1350, covers only "any civil action *by an alien* for a tort only . . . ." (Emphasis added.) Principles of legislative jurisdiction in international law recognize authority based not only on territory, but also on nationality. See Restatement (Third) of Foreign Relations Law of the United States, § 402, which provides that subject to certain reasonableness limitations, "a state has jurisdiction to prescribe law with respect to . . . the activities, interests, status, or relations of its nationals outside as well as within its territory." *Id.* § 402(2). In fact, if it were true that there is no *Bivens* theory under which a U.S. citizen may sue an official of the U.S. government (including a military official) who tortures that citizen on foreign land under the control of the United States (including its military), then U.S. citizens will be singled out as the only ones *without* a remedy under U.S. law. That is because existing law permits a U.S. citizen to sue a foreign official, and an alien can sue anyone who has committed a tort in violation of the law of nations. Only by acknowledging

the *Bivens* remedy is it possible to avoid treating U.S. citizens worse than we treat others. The fear of offense to our allies that the majority fears dissipates as soon as we look at the broader picture.

### III

I turn finally to Part IV of the majority's opinion, in which it concludes that Secretary Rumsfeld cannot be held liable to Vance and Ertel no matter what one says about other military personnel and civilians who work for the armed forces. Here the majority properly reserves a critical question. Vance and Ertel, it notes, "do not contend that [Secretary Rumsfeld's] policies authorized harsh interrogation of security detainees, as opposed to enemy combatants." *Ante* at 23. Thus, it concludes, "[t]he extent to which untenable directives, policies, and regulations may support awards of damages can safely be postponed to another day." *Ante* at 24. I wholeheartedly endorse this statement.

With that said, I conclude, along with the majority, that the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governs our decision here. In *Iqbal*, the Court concluded that the Attorney General's knowledge of and participation in the mistreatment of the plaintiff was remote enough that he could not be held vicariously liable for the actions of his subordinates. The same must be said of Secretary Rumsfeld. This is not because his leadership of the Department of Defense had nothing to do with the plaintiffs' injuries. His approval of the so-called harsh techniques may have

egged subordinates on to more extreme measures—measures that surely violated the standards of the Detainee Treatment Act of 2005, as well as broader norms such as those in the CAT. But the link between their mistreatment and the Secretary's policies authorizing extreme tactics for enemy combatants is too attenuated to support this case.

## IV

In closing, I wish to stress that I do not rest any part of my analysis on the fear that *Bivens* liability would cause Cabinet Secretaries to carry out their responsibilities with one eye on their wallets, rather than for the greater good of their department and the country. The majority suggests as much in several places, see *ante* at 12, 17-18, but I find this disrespectful of both the dedication of those who serve in government and the serious interests that the plaintiffs are raising. The majority's suggestions derive from comments the Court has made over the years in its qualified immunity decisions, where it has considered the question whether personal liability for constitutional torts might "dampen the ardor of all but the most resolute . . . in the unflinching discharge of their duties." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Learned Hand, J.)); see also *Butz v. Economou*, 438 U.S. 478, 506 (1978) (highlighting "public interest in encouraging the vigorous exercise of official authority"); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (noting that "permitting damages suits against government

officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."). But, as the Court has also acknowledged, that concern represents only one side of the balance. Otherwise, it would have adopted a rule of absolute immunity for government actors, in place of the qualified immunity it chose. *Bivens*, and its counterpart for state actors, 42 U.S.C. § 1983, rest on the countervailing fact that the threat of personal liability for violations of clearly established rules gives some teeth to the need to conform to constitutional boundaries. Courts must balance the risk of over-deterrence against "the public interest in deterrence of unlawful conduct and in compensation of victims." *Harlow*, 457 U.S. at 819; see also *Carlson v. Green*, 446 U.S. 14, 21 (1980) ("It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability.") (internal citation omitted). While I recognize the need to avoid over-deterrence, I see nothing in this case that requires us to depart from the "balance that [the Supreme Court's] cases [traditionally] strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties" through qualified immunity. *Anderson*, 483 U.S. at 639.

Finally, I add that our decision here spells the practical end to this case. This is certainly true with respect to the "John Doe" defendants. The two-year statute of limitations that we apply in *Bivens* cases has long since

run, and we do not permit relation back under Federal Rule of Civil Procedure 15(c)(1)(C) where the plaintiff simply did not know whom to sue. See, *e.g.*, *Hall v. Norfolk So. Ry. Co.*, 469 F.3d 590, 597 (7th Cir. 2006); *King v. One Unknown Federal Correctional Officer*, 201 F.3d 910, 914 (7th Cir. 2000); see generally 6A Charles Alan Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 1498.3 (3d ed. 2010).

I therefore respectfully concur only in the judgment of the court.

HAMILTON, *Circuit Judge*, joined by ROVNER and WILLIAMS, *Circuit Judges*, dissenting.  All members of this court agree that plaintiffs Vance and Ertel have alleged that members of the United States military tortured them in violation of the United States Constitution, and that in reviewing a denial of a motion to dismiss under Rule 12(b)(6), we must accept those allegations as true. Our disagreement is about whether plaintiffs have a civil remedy available to them under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which allows a victim of a constitutional violation to sue a responsible federal officer or employee for damages.

If a victim of torture by the Syrian military can find his torturer in the United States, U.S. law provides a civil

remedy against the torturer. Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note. If the victim is killed, the same U.S. law provides his survivors a civil remedy. The same could be said for victims of torture by any other government in the world — any other, that is, except one. Under the majority's decision, civilian U.S. citizens who are tortured or worse by our own military have no such remedy. That disparity attributes to our government and to our legal system a degree of hypocrisy that is breathtaking.

The majority's result is not required or justified by Supreme Court precedent, and it fails to carry out the judiciary's responsibility under Supreme Court precedents to protect individual rights under the Constitution, including a right so basic as not to be tortured by our government. Although the majority opinion is written in terms of whether to "create" a cause of action under *Bivens*, the majority in effect creates a new absolute immunity from *Bivens* liability for all members of the U.S. military. This new absolute immunity applies not only to former Secretary Rumsfeld but to all members of the military, including those who were literally hands-on in torturing these plaintiffs. It applies to military mistreatment of civilians not only in Iraq but also in Illinois, Wisconsin, and Indiana.

The majority's immunity is even more sweeping than the government and former Secretary Rumsfeld sought. To find this immunity, the majority relies on *Chappell v. Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley*, 483 U.S. 669 (1987), which each held that soldiers

may not sue under *Bivens* for injuries "incident to service." The majority decision takes *Chappell* and *Stanley* far beyond their holdings and rationales, granting the entire U.S. military an exemption from all *Bivens* liability, even to civilians. The majority decision is also difficult to reconcile with *Mitchell v. Forsyth*, 472 U.S. 511, 520-24 (1985), which held that national security considerations did not entitle another former cabinet officer to absolute immunity in a *Bivens* action.

For these reasons, and because this appeal raises such fundamental issues about the relationship between the American people and our government, I respectfully dissent. The panel opinion explained in detail why the civil immunity sought by defendants is not justified for a claim for torture or worse in a U.S. military prison in Iraq. *Vance v. Rumsfeld*, 653 F.3d 591 (7th Cir. 2011). I will not repeat here all the details from the panel opinion. Instead, I address the majority's new grant of an even broader immunity and explain the core Supreme Court precedents, the relevant legislation, and the reasoning that should allow plaintiffs to pursue their claims for torture. Part I first reviews the familiar elements of plaintiffs' *Bivens* claims and then explains the errors in the majority's reliance on *Chappell* and *Stanley*, as well as the import of *Mitchell* and other cases rejecting absolute immunity in similar *Bivens* cases. Part I then turns to the legislation indicating that Congress has assumed that *Bivens* applies to cases like this one, as well as the anomalous consequences of the majority's decision. Finally, the opinion addresses briefly in Part II

the sufficiency of the allegations against Mr. Rumsfeld personally and in Part III the question of qualified immunity.[1]

I. *Civilian Remedies Under Bivens for Military Wrongdoing*

Before this en banc decision and the Fourth Circuit's recent decision in *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012), there should have been no doubt that a civilian U.S. citizen prisoner tortured by a federal official, even a military officer, could sue for damages under *Bivens*. See *Carlson v. Green*, 446 U.S. 14 (1980) (allowing *Bivens* claim against prison officials who were deliberately indifferent to prisoner's serious medical needs); *Saucier v. Katz*, 533 U.S. 194 (2001) (holding that military police officer was entitled to qualified immunity on civilian's *Bivens* claim for excessive force, without suggesting that defendant's status as military officer alone would bar *Bivens* action). The majority rejects this conclusion, at least for torture by military personnel, by asking the wrong question. Plaintiffs are not asking this court to *create* a cause of action. It already exists. It is the defendants who have sought and have now been given a new, extraordinary, and anomalous *exception* to *Bivens*.

---

[1] I continue to agree with the panel decision directing dismissal of the plaintiffs' claims against the United States for deprivation of their property in No. 10-2442, adopted by Part II of the majority opinion. See *Vance*, 653 F.3d at 626-27.

A. *The Familiar Elements of Plaintiffs' Bivens Claims*

All the key elements of plaintiffs' *Bivens* claims are well established under Supreme Court precedent: (1) prisoners may sue for abuse by federal officials; (2) civilians may sue military personnel; (3) the Constitution governs the relationship between U.S. citizens and their government overseas; and (4) claims against current and former cabinet officials are permitted. Permitting a *Bivens* claim for torture by military personnel should not be controversial, at least barring interference with combat or other highly sensitive activity, which is not involved here.

First, of course, *Bivens* is available to prisoners who have been abused or mistreated by their federal jailors, and that reasoning certainly extends to the torture alleged here. In *Carlson v. Green*, 446 U.S. 14, the Supreme Court reversed dismissal of a complaint in which a deceased prisoner's representative sued for violation of the Eighth Amendment prohibition on cruel and unusual punishment, in that case through an alleged deliberate denial of needed medical care. Since *Carlson*, federal courts have routinely considered prisoners' constitutional claims against federal prison officials. *E.g.*, *Bagola v. Kindt*, 131 F.3d 632 (7th Cir. 1997) (district court properly heard *Bivens* claim alleging injury as part of prison work program where workers' compensation program did not provide adequate safeguards to protect prisoner's Eighth Amendment rights); *Del Raine v. Williford*, 32 F.3d 1024 (7th Cir. 1994) (recognizing prisoner's *Bivens* claim alleging that he was forced to

live in bitterly cold cell). As Judge Wood points out, the torture alleged here lies at the extreme end of abuse that violates the Constitution.

Second, under *Bivens* civilians may sue military personnel who violate their constitutional rights. For example, *Saucier v. Katz*, 533 U.S. 194, an important but now overruled case on procedures for deciding qualified immunity, was a *Bivens* claim for excessive force brought by a civilian against a military police officer. *Saucier* did not hint that the civilian could not sue the military police officer for violations of clearly established constitutional rights. If the majority were correct, though, the Supreme Court in *Saucier* should have simply rejected the *Bivens* claim altogether, not explored the nuances of procedures for deciding qualified immunity.

Circuit and district courts have decided many *Bivens* cases brought by civilians against military personnel. While such claims often fail on the merits or for other reasons, the fact that a civilian has sued a military official is not a basis for denying relief under *Bivens*. If the majority here were right, though, all such cases should have been dismissed on the new and simple theory that military personnel are altogether immune from *Bivens* liability. See, *e.g.*, *Case v. Milewski*, 327 F.3d 564 (7th Cir. 2003) (civilian claim against military officers for Fourth and Fifth Amendment violations); *Morgan v. United States*, 323 F.3d 776 (9th Cir. 2003) (civilian claim against military police for search of vehicle); *Roman v. Townsend*, 224 F.3d 24 (1st Cir. 2000) (civilian claim

against military police officer and Secretary of the Army for improper arrest and treatment in detention); *Applewhite v. United States Air Force*, 995 F.2d 997 (10th Cir. 1993) (civilian claim against military investigators for unlawful search and removal from military base); *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 761 (4th Cir. 1990) (civilian claim against military officers for deprivation of property without due process of law); see also *Newton v. Lee*, 677 F.3d 1017, 1028 (10th Cir. 2012) (civilian claim against state National Guard officers under § 1983 for due process violation); *Meister v. Texas Adjutant General's Dep't*, 233 F.3d 332, 338 (5th Cir. 2000) (civilian employee of state National Guard could bring constitutional claims against officers under § 1983); *Wright v. Park*, 5 F.3d 586 (1st Cir. 1993) (whether National Guard technician could bring *Bivens* claim depended on whether he was deemed civilian or military personnel); *Fields v. Blake*, 349 F. Supp. 2d 910, 921 (E.D. Pa. 2004) (summary judgment on the merits of civilian's claim against military officer for unconstitutional arrest); *Willson v. Cagle*, 711 F. Supp. 1521, 1526 (N.D. Cal. 1988) (concluding that "a *Bivens* action may potentially lie against military officers and civilian employees of the military" for protesters injured when a military munitions train collided with them), *aff'd mem.*, 900 F.2d 263 (9th Cir. 1990) (affirming denial of qualified immunity); *Barrett v. United States*, 622 F. Supp. 574 (S.D.N.Y. 1985) (allowing civilian's *Bivens* claim to proceed against military officials for their alleged concealment of their roles in the creation and administration of an

army chemical warfare experiment), *aff'd*, 798 F.2d 565 (2d Cir. 1986).[2]

Third, when civilian U.S. citizens leave the United States, we take with us the constitutional rights that protect us from our government. In *Reid v. Covert*, 354 U.S. 1 (1957), the Supreme Court held that civilian members of military families could not be tried in courts martial. Justice Black wrote for a plurality of four Justices:

> At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. *When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.* This is not a novel concept. To the contrary, it is as old as government.

*Id*. at 5-6 (emphasis added). That general proposition remains vital, as reaffirmed in *Boumediene v. Bush*, holding

---

[2] Among the cited cases, *Newton*, *Meister*, and *Wright* involved claims under 42 U.S.C. § 1983 against military officials in state National Guards, but the courts in those cases tracked the *Bivens* analysis under the *Chappell*, *Stanley*, and *Feres* cases discussed below.

that aliens held as combatants at Guantanamo Bay may invoke the writ of habeas corpus to challenge their detention: "Even when the United States acts outside its borders, its powers are not 'absolute and unlimited' but are subject 'to such restrictions as are expressed in the Constitution.'" 553 U.S. 723, 765 (2008), quoting *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885); see also *Munaf v. Geren*, 553 U.S. 674, 688 (2008) (holding that civilian U.S. citizens held in U.S. military custody in Iraq could petition for a writ of habeas corpus in federal district court). Cf. *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (holding that non-resident alien could not invoke Fourth Amendment to challenge search by U.S. officials in foreign country).[3]

Fourth, our laws permit suit against public officials for actions taken while serving at the highest levels of the United States government. The majority expresses great concern over former Secretary Rumsfeld's personal finances and how the risk of *Bivens* liability might affect other senior government officials as they perform their

---

[3] The majority cites *Verdugo-Urquidez* to show it is "not settled" whether the Constitution applies to interrogation outside the United States, slip op. at 7-8, but the majority ignores the fact that the party in that case was a non-resident alien, not a citizen or national of the United States. *Reid* and *Munaf* show it is well established that U.S. citizens do not abandon their constitutional rights with respect to their own government when leaving U.S. borders. This dicta from our court should most definitely not be used to justify a defense of qualified immunity by federal personnel who violate constitutional rights in overseas interrogations.

public duties. The policy balances that are always part of *Bivens* analysis are no doubt delicate. The defendant's former rank, however, is not a basis for rejecting these plaintiffs' claims. The Supreme Court has repeatedly permitted *Bivens* actions against other cabinet members. See, *e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511 (1985) (former Attorney General was entitled to qualified immunity, not absolute immunity, from damages suit arising out of national security-related actions); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (senior presidential aides are entitled to qualified immunity, not absolute immunity, from liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"); *Halperin v. Kissinger*, 606 F.2d 1192 (D.C. Cir. 1979) (senior executive branch officials, including a former President, were not absolutely immune from suit for damages by citizen alleging an unconstitutional wiretap), *aff'd in relevant part*, 452 U.S. 713 (1981); *Butz v. Economou*, 438 U.S. 478 (1978) (Secretary of Agriculture and other executive branch officials ordinarily may be entitled to qualified, not absolute, immunity from constitutional claims).

B.  *Bivens Cases Involving the Military and National Security*

Without coming to grips with the principles and precedents supporting plaintiffs' claims here, the majority errs by relying on *Chappell v. Wallace* and *United States v. Stanley* to exempt any military personnel from civil liability for violating the constitutional rights of civilians.

The Supreme Court itself has never adopted or even suggested such a sweeping view.

*Chappell* was the easier case, in which enlisted sailors sued their direct superior officers under *Bivens* for race discrimination. In dismissing those claims, the Court was guided by the *Feres* doctrine under the Federal Tort Claims Act, which bars military personnel from suing for injuries "incident to service." See *Feres v. United States*, 340 U.S. 135 (1950). Relying on *Feres*, the *Chappell* Court held unanimously that the sailors could not sue their direct superior officers under *Bivens*. 462 U.S. at 305. Nothing in *Chappell* hinted that its reasoning would apply to civilians whose constitutional rights were violated by military personnel, and it is well established that the *Feres* doctrine does not apply to claims by civilians. *E.g.*, *United States v. Brown*, 348 U.S. 110 (1954); *M.M.H. v. United States*, 966 F.2d 285, 288-89 (7th Cir. 1992) (*Feres* doctrine did not apply to veteran's negligence claim based on Army's negligence after veteran's discharge); *Rogers v. United States*, 902 F.2d 1268, 1273-74 (7th Cir. 1990). The reliance on the *Feres* doctrine is a strong signal that *Chappell* does not reach claims by civilians and that the majority errs by relying upon it here.

*Stanley* also provides no basis for barring *Bivens* claims by civilians. While plaintiff Stanley was serving in the Army, he was exposed to LSD without his consent in secret experiments, resulting in serious harm to him and his family. He sued under *Bivens* for violation of his constitutional rights. The potential individual defendants would have included not his direct superior

officers but other military and civilian personnel. A closely divided Supreme Court held that he could not sue under *Bivens* because his injuries arose incident to his military service, essentially applying the full extent of the *Feres* "incident to service" standard to *Bivens* claims by military personnel. 483 U.S. at 684 ("We hold that no *Bivens* remedy is available for injuries that 'arise out of or are in the course of activity incident to service.'"), quoting *Feres*, 340 U.S. at 146. *Stanley* teaches that the plaintiff's status as military or civilian is decisive in a *Bivens* case, not that military defendants cannot be sued under *Bivens*.

The majority's use of *Stanley* to bar torture claims by *civilians* depends on dicta severed from context: "The 'special factor' that 'counsels hesitation' is not the fact that Congress has chosen to afford some manner of relief in the particular case, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate." Slip op. at 11-12, quoting 483 U.S. at 683. That sentence cannot reasonably be read to have extended a blanket exemption to all U.S. military personnel for *Bivens* liability to civilians. That was not the issue before the Court, and the Court would not have casually embraced such a sweeping rule in dicta. Even if it had, surely someone would have noticed. Until the majority's decision here, though, no other circuit court has read *Chappell* and *Stanley* to produce this extraordinary result.[4]

---

[4] Even the Fourth Circuit's opinion in *Lebron* did not go as far as the majority. *Lebron* rejected *Bivens* claims by a U.S. citizen

(continued...)

We should focus instead on the Supreme Court's more relevant decisions in *Mitchell v. Forsyth*, 472 U.S. 551, and *Scheuer v. Rhodes*, 416 U.S. 232 (1974). In *Mitchell*, the Court held that former Attorney General Mitchell was not entitled to absolute immunity from *Bivens* liability for ordering unconstitutional surveillance of the plaintiff even though Mr. Mitchell argued he acted for reasons of national security. 472 U.S. at 520-24. The Court observed that the national security context counseled in favor of permitting the suit. Because national security tasks are carried out in secret, "it is far more likely that actual abuses will go uncovered than that fancied abuses will give rise to unfounded and burdensome litigation," *id.* at 522, and the "danger that high federal officials will disregard constitutional

---

[4] (...continued)
held in military custody after the President himself had designated the plaintiff an enemy combatant. First, the *Lebron* court emphasized the enemy combatant designation. 670 F.3d at 549. Second, the plaintiff had dropped claims against the lower-level personnel with hands-on responsibility for his treatment. He was pursuing only high-level policy claims that raised "fundamental questions incident to the conduct of armed conflict." *Id.* at 550. The plaintiffs in this case, by contrast, were employed by U.S. military contractors and were trying to help the FBI investigate corruption in the U.S. mission to Iraq. They assert claims that are perfectly consistent with U.S. law and stated military policy on interrogation techniques and treatment of prisoners. Plaintiffs contend here that the defendants violated military policy and U.S. statutes, as well as the Constitution.

rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute immunity," *id*. at 523.

The *Mitchell* Court anticipated and firmly rejected the majority's arguments for absolute immunity based on concerns about the chilling effect that the prospect of personal liability might have for even senior govern-ment officials. The Court held instead that qualified immunity would strike the correct balance between deterring clear violations of constitutional rights and giving government officials room for discretionary judg-ment and reasonable mistakes:

> "Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate . . . ." [*Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (emphasis added).] This is as true in matters of national security as in other fields of government action. We do not believe that the security of the Republic will be threatened if its Attorney General is given incentives to abide by clearly established law.

472 U.S. at 524. That reasoning applies directly to this case and to the Secretary of Defense and other military personnel in the operation of military prisons.

*Scheuer v. Rhodes* arose from the fatal shots that National Guardsmen fired at protesting students at Kent State University in 1970. The plaintiffs alleged constitutional violations in a suit under 42 U.S.C. § 1983 against the state's governor and several officers in the National Guard. The defendants argued they were

entitled to absolute immunity when using military force to restore public order. The Supreme Court unanimously rejected that defense and held that the defendants were entitled to only qualified immunity for these claims by civilians. 416 U.S. at 248-49. Because the defendants were state officials, the suit was under section 1983 rather than *Bivens*, but for present purposes the key point is that the use of military force against civilians was subject to only qualified immunity, not the absolute immunity that the majority in this case grants to military personnel.[5]

C. *Legislation and "Special Factors"*

In addition to reading *Chappell* and *Stanley* too broadly, the heart of the majority opinion converts the second step of *Bivens* analysis — looking at "special factors" that

---

[5] The majority's discussion of *Chappell* and *Wallace* begins with what in football would be called a head-fake, suggesting mistakenly that because plaintiffs Vance and Ertel were civilians working for a military contractor, they might be deemed soldiers for purposes of *Bivens*, *Chappell*, and *Stanley*. Slip op. at 10-11. Under the statutes cited by the majority, plaintiffs could have been subject to *civilian* U.S. criminal law if they had been suspected of committing a crime in Iraq. See 18 U.S.C. §§ 3261, 3267(1)(A)(iii). Section 3261 does not treat them as soldiers or make them subject to military discipline or the Uniform Code of Military Justice. Also, of course, no one relied on section 3261 to detain plaintiffs, let alone to justify torturing them.

might counsel hesitation before authorizing the claim — into a search for evidence that Congress has expressly authorized *Bivens* actions against U.S. military personnel. This method of analysis fails to follow the Supreme Court's instructions for considering new questions about the scope of the *Bivens* remedy. The first step is to consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). The short answer is no. The defendants do not suggest that there is any alternative remedial scheme at all comparable to a potential *Bivens* remedy in the way that Social Security procedures and remedies in *Schweiker* or the federal civil service procedures and remedies in *Bush* provided substitute remedies that foreclosed *Bivens* remedies. See *Schweiker v. Chilicky*, 487 U.S. 412 (1988); *Bush v. Lucas*, 462 U.S. 367 (1983).

Because there is no sufficient alternative, we should proceed to the second step of the *Bivens* test as described in *Bush v. Lucas*: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." 462 U.S. at 378, quoted in *Wilkie*, 551 U.S. at 550.

The focus before the panel was on torture claims arising from military custody in the controlled, non-combat environment of military prisons in an overseas war

zone. That context requires careful balancing under the second step of the *Bivens* analysis, and the panel opinion discussed the relevant considerations for rejecting the defense arguments based on the narrower rationale they offered. See *Vance*, 653 F.3d at 617-26. Because the en banc majority's approach sweeps so much more broadly than the defendants' own arguments, I will not repeat the panel's discussion here. The majority reviews a wide range of statutes and finds in them congressional disfavor for *Bivens* actions against military personnel generally, based on an inference that Congress would prefer to have compensation for wrongs done by the military come from the Treasury rather than the judgments against individual personnel.

When we look closely at the statutes, however, it should become clear that Congress has legislated on the assumption that U.S. nationals, at least, should have *Bivens* remedies against U.S. military personnel in most situations.

First, let's look at legislation on the subject of torture. Torture is a crime under international and U.S. law. U.S. law provides expressly for civil remedies for victims of torture by government officials of *other* nations in the Torture Victim Protection Act of 1991, Pub. L. 102-256, codified as note to the Alien Tort Statute, 28 U.S.C. § 1350. Section 2(a) of that Act provides a cause of action for damages against a person who, "under actual or apparent authority, or color of law, of any foreign nation," subjects another person to torture or extra-judicial killing. Section 2(b) requires U.S. courts to decline to hear such claims "if the claimant has not ex-

hausted adequate and available remedies in the place"
where the conduct occurred. Under the Act, if an alien
has been tortured by her own government, and if that
foreign government provides no adequate and available
civil remedies, then a U.S. court can hear the case
against a defendant found here.

Under the majority holding here, however, the same
U.S. courts are closed to U.S. citizens who are victims
of torture by U.S. military personnel. The majority thus
errs by attributing to Congress an intention to deny
U.S. civilians a right that Congress has expressly ex-
tended to the rest of the world. A victim of torture by
the Syrian military, for example, can sue in a U.S. court,
but a U.S. citizen tortured by the U.S. military cannot.
That conclusion should be deeply troubling, to put it
mildly. We should not attribute that improbable view
to Congress without a far more compelling basis
than the majority offers.

To illustrate this anomaly further, suppose another
country has enacted its own law identical to the U.S.
Torture Victim Protection Act. Under the majority's
reasoning, there are no "adequate and available
remedies in the place" where the conduct occurred (a
U.S. military base). If Mr. Rumsfeld could be found
visiting a country with its own TVPA (so he could be
served with process), plaintiffs Vance and Ertel could sue
him in that country under its TVPA because U.S. law
would provide no remedy. Surely the Congress that
enacted the Torture Victim Protection Act would
rather have such claims against U.S. officials heard in
U.S. courts.

In fact, the U.S. government has relied on the availability of *Bivens* claims in cases of government torture to help show that the U.S. is complying with our obligations under the United Nations Convention Against Torture. A United Nations committee overseeing compliance questioned the fact that the United States had enacted virtually no new legislation to implement the Convention Against Torture. *The State Department assured the United Nations that the Bivens remedy is available to victims of torture by U.S. officials.* The State Department made no exception for military personnel, who were the principal focus of the U.N. inquiry. See United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (Apr. 28, 2006) (Question 5), available at http://www.state.gov/g/drl/rls/68554.htm (last accessed Oct. 25, 2012); see also *Arar v. Ashcroft*, 585 F.3d 559, 619 (2d Cir. 2009) (en banc) (Parker, J., dissenting) (pointing out this reliance on *Bivens*).

In addition to the Torture Victim Protection Act, Congress acted in the Detainee Treatment Act of 2005 to grant only *limited* (good faith) immunity to U.S. personnel, including military personnel, in lawsuits by alien detainees. For those alien plaintiffs, Congress opted to regulate — not prohibit — civil damages claims against military officials accused of torturing aliens suspected of terrorism. Congress created a good-faith defense in civil and criminal cases for officials who believed that their actions were legal and authorized by the U.S. government:

> In any civil action or criminal prosecution against an officer, employee, member of the Armed Forces, or other agent of the United States Government [for engaging in practices involving detention and interrogation of alien detainees suspected of terrorism] it shall be a defense that such officer, employee, member of the Armed Forces, or other agent did not know that the practices were unlawful and a person of ordinary sense and understanding would not know the practices were unlawful . . . . Nothing in this section shall be construed to limit or extinguish any defense or protection otherwise available to any person or entity from suit, civil or criminal liability, or damages, or to provide immunity from prosecution for any criminal offense by the proper authorities.

42 U.S.C. § 2000dd-1(a). This express but limited defense against civil claims by alien detainees suspected of terrorism is a strong indication that Congress has not closed the door on judicial remedies that are "otherwise available," certainly for U.S. citizens, even though it chose not to wrestle with just what those remedies might be.[6]

---

[6] The majority cites the Military Commissions Act of 2006, Pub. L. No. 109-366, § 7(a), codified as 28 U.S.C. § 2241(e), 120 Stat. 2600, 2635-36 (2006), enacted after Vance and Ertel were in custody. In that Act, Congress prohibited federal courts from exercising jurisdiction over a civil claim by an alien "properly detained as an enemy combatant." That narrow prohibition

(continued...)

Congress took the trouble to grant limited immunity in civil actions brought by aliens. Just what potential civil liability did Congress have in mind? *Bivens* suits are the most obvious candidate.

To avoid this reasoning, the majority misses the mark by suggesting that Congress might have been worried about suits brought by aliens under the Torture Victim Protection Act, the law of the nation where the torture occurred, or the Alien Tort Statute. Slip op. at 16-17. First, the Torture Victim Protection Act applies only to torture carried out "under actual or apparent authority, or color of law, of any *foreign* nation." The Act does not apply at all to torture under color of U.S. law. Second, if an alien were to sue under the law of the nation where the torture took place, it is not likely that the other nation's law would take into account a defense created by U.S. law. As for the Alien Tort Statute, such a claim by an alien against a U.S. official would be a fairly exotic creature, especially as compared to the familiar *Bivens* doctrine.

Young doctors are taught, "When you hear hoofbeats, think horses, not zebras." The point is that when trying to explain an unknown phenomenon, it's usually sensible to look first to the familiar and only later to the exotic. That reasoning applies here. When Congress

---

[6] (...continued)

clearly does not apply to Vance or Ertel, and the very narrowness of it indicates that Congress has not acted to bar actions like this one, by U.S. citizens who were not enemy combatants.

created the limited good-faith immunity from civil claims by aliens in the Detainee Treatment Act, *Bivens* had been a major part of U.S. law for 40 years. If Congress had wanted to grant absolute immunity against claims by aliens, it would have been easy to draft different language. Congress chose instead to grant qualified immunity in suits by alien detainees, a policy decision that was consistent with the Supreme Court's reasoning in *Mitchell v. Forsyth*, 472 U.S. at 523-24.

The majority reasons that the DTA's grant of qualified immunity in suits brought by aliens does not imply that similar remedies would be available to U.S. citizens. By that route, the majority reaches another odd result. Under the majority's reasoning, aliens tortured by the U.S. military in violation of international law have more rights than U.S. citizens: Aliens could sue U.S. military officers for torture (under *Bivens*, or the Alien Tort Statute, or both). They would still need to overcome the DTA's qualified immunity, but under the majority's reading, U.S. citizens cannot bring such a suit at all. That reading of congressional intent is highly improbable. Reading the DTA, it is more reasonable to attribute to Congress the assumption that courts would allow U.S. citizens to pursue relief under *Bivens*, subject to the familiar qualified immunity defense.

Looking to other legislation, the majority criticizes plaintiffs for not having sought relief under the Military Claims Act, 10 U.S.C. § 2733, or the Foreign Claims Act, 10 U.S.C. § 2734, though the majority wisely concedes at least for the sake of argument that these statutes are

not full substitutes for a *Bivens* remedy. Slip op. at 15. This criticism is misguided, as implied by the fact that even the defendants did not rely on these statutes at all before the en banc phase of the case. At the most basic level, those laws simply do not apply to claims for constitutional violations. 32 C.F.R. § 536.42. Nor do they apply to intentional torts, including assault, battery, and false imprisonment. 32 C.F.R. § 536.45(h). Plaintiffs would have been wasting everyone's time by asserting claims under either Act.[7]

### D.  *The Role of Citizenship in Constitutional Remedies*

The panel relied on plaintiffs' status as U.S. citizens to distinguish *Arar v. Ashcroft*, 585 F.3d 559, and *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011), where plaintiffs asserting torture claims under *Bivens* were aliens. The panel issued its decision before *Lebron*, 670 F.3d 540, and *Doe v. Rumsfeld*, 683 F.3d 390 (D.C. Cir. 2012), went further and dismissed similar *Bivens* claims by U.S. citizens. The majority describes the panel's distinction be-

---

[7]  Sections 536.42 and 536.45(h) apply to claims under both the MCA and the FCA. Even if those laws could apply to these plaintiffs' allegations, relief under the MCA and FCA is unlike the remedies in *Schweiker* and *Bush* because it is left to the discretion of the Secretary of the Army or Defense and there is no right to judicial review. Also, plaintiffs Vance and Ertel probably would not have qualified as "inhabitants" of a foreign country as required for the limited and discretionary relief under the FCA. See 10 U.S.C. § 2734(a).

tween citizens and aliens as "offensive to our allies" and "offensive to our own principles of equal treatment." Slip op. at 18. The prohibitions against torture are matters of international law as well as U.S. law, and those prohibitions reflect basic and universal human rights. That does not mean, however, that citizenship is irrelevant in deciding about remedies for torture. If the U.S. government harms citizens of other nations, they can turn to their home governments to stand up for their rights. That is not true for these U.S. citizens alleging torture by their own government. No other government can stand up for them.

Other federal courts have faced difficult issues when alien enemy combatants have sought protection in civilian U.S. courts. U.S. courts have been reluctant to extend constitutional protections to such parties or to examine too closely the actions of our military in armed conflicts. We do not need to decide those difficult issues in this case, which was brought not by members of al Qaeda or designated enemy combatants, but by U.S. citizens working for military contractors and trying to help the FBI uncover corrupt dealings that were endangering U.S. troops. The enemy combatant cases are difficult, but we should not let those difficulties lead us to turn our backs on legitimate constitutional claims of U.S. citizens.

The Supreme Court has relied on the difference between citizens and aliens in deciding whether to allow access to civilian U.S. courts in similar contexts. We should decide this case in favor of allowing these U.S. citizens to proceed, even if we might be reluctant to

extend such rights to enemy combatants or other alien detainees in Iraq or other war zones.

When considering actions our government takes overseas, there is room to distinguish between the government's duties to its own citizens and duties it may have to other persons. As the Supreme Court concluded in *Reid*: "When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." 354 U.S. at 6 (plurality opinion of Black, J.); see also *Kar v. Rumsfeld*, 580 F. Supp. 2d 80, 83 (D.D.C. 2008) (finding that the "Fourth and Fifth Amendments certainly protect U.S. citizens detained in the course of hostilities in Iraq"), citing *Reid* and *United States v. Toscanino*, 500 F.2d 267, 280 (2d Cir. 1974) ("That the Bill of Rights has extraterritorial application to the conduct of federal agents directed at United States citizens is well settled.").

In fact, the Supreme Court has distinguished between citizens and aliens in deciding whether remedies were available in civilian courts for U.S. military detention overseas. In *Johnson v. Eisentrager*, 339 U.S. 763, 785 (1950), the Supreme Court held that enemy aliens (Germans working in Asia to aid Japan after the German surrender in 1945) were not entitled to seek writs of habeas corpus in civilian U.S. courts. *Eisentrager* repeatedly made clear that its holding was limited to aliens during wartime and did not apply to U.S. citizens.

For example: "our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens . . . ." *Id*. at 769. "With the citizen we are now little concerned, except to set his case apart as untouched by this decision and to take measure of the difference between his status and that of all categories of aliens. Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection." *Id.*[8]

More recently, the Supreme Court relied on this distinction between aliens and citizens in *Munaf v. Green*, 553 U.S. 674, 685-88 (2008), holding unanimously that U.S. citizens in U.S. military custody in Iraq were entitled to seek habeas corpus relief in U.S. civilian

---

[8] Justice Jackson's reference in *Eisentrager* to the Apostle Paul fits surprisingly well with today's case. See Acts 25:11 (Paul invokes Roman citizen's right to appeal to emperor); Acts 22:25-29 (Paul invokes his Roman citizenship as defense against being flogged before he was convicted of any crime); Acts 16:35-39 (upon being told he was free to leave prison, "Paul replied, 'They have beaten us in public, uncondemned, men who are Roman citizens, and have thrown us into prison; and now are they going to discharge us in secret? Certainly not! Let them come and take us out themselves.' The police reported these words to the magistrates, and they were afraid when they heard that they were Roman citizens; so they came and apologized to them.").

courts. *Munaf* distinguished *Hirota v. MacArthur*, 338 U.S. 197 (1948), which held that aliens in military custody overseas could not seek habeas relief in civilian courts. To support its use of the difference between citizens and aliens, the *Munaf* Court cited *Eisentrager*, *Rasul v. Bush*, 542 U.S. 466, 486 (2004) (Kennedy, J., concurring in judgment), and the D.C. Circuit's opinions in *Munaf* itself. 553 U.S. at 688. (In fact, the government did not even try to argue in *Munaf* that U.S. citizens in military custody in Iraq could not have access to civilian U.S. courts. The government instead argued unsuccessfully that the petitioners were in international custody rather than U.S. custody. *Id.* at 687-88.)

Distinguishing between citizens and aliens is not beyond controversy, but in these sensitive contexts involving overseas activity, it is sometimes decisive. In this case brought by U.S. citizens, we do not need to decide the different issues posed by plaintiffs who are alien enemy combatants. But if we follow the majority's route of equal treatment, notwithstanding *Munaf*, *Eisentrager*, and *Rasul*, we should not treat these U.S. citizens as if they were known terrorists and enemy combatants who are subject to torture, "extraordinary rendition," and indefinite detention. Our law's treatment of U.S. citizens should not be brought down to the floor that we are now tolerating for the most dangerous foreign terrorists.

II. *Personal Responsibility*

As explained above, the majority opinion erroneously grants absolute immunity to U.S. military personnel from civilians' *Bivens* suits, not only for former Secretary Rumsfeld and other senior officials but also for lower-ranking personnel, including even those who were literally hands-on in torturing the plaintiffs. Under that reasoning, the majority need not reach the issue of personal responsibility for any defendant. Also, since the panel decision, plaintiffs have been able to learn the identities of the personnel directly responsible for torturing them. Because plaintiffs now have the information they would need to amend their complaint to add those individuals as defendants, the issue of former Secretary Rumsfeld's personal responsibility has less practical significance now than it did in the district court or before our court's panel. Nevertheless, because the majority also reaches the issue, and because the question must be addressed to affirm the district court's denial of dismissal, it must be addressed here.

I agree with the majority's general statements of the law of personal responsibility under *Bivens* and 42 U.S.C. § 1983. Responsibility is personal, not vicarious. Where we differ is in the application of those general principles to plaintiffs' second amended complaint. The majority offers the following examples:

> The Director of the FBI allows field agents to carry guns and permits them to use deadly force. Yet if an agent shoots a fleeing suspect in the back, violating the fourth amendment, see *Tennes-*

*see v. Garner*, 471 U.S. 1 (1985), the Director is not liable just because the gun, issued under the Director's policy, was a cause of the injury. Similarly for a police chief who establishes a K-9 squad, if a dog bites a bystander, or who authorizes search or arrest based on probable cause, if the police then search or arrest *without* probable cause.

Slip op. at 20-21. The majority is correct about those examples, but they miss the target of plaintiffs' actual allegations. To sharpen the issue, suppose instead that a local police chief or even the FBI director issued a policy that authorized the use of deadly force against any fleeing suspect. The policy itself would be unconstitutional under *Tennessee v. Garner*. The chief or director who authorized that unconstitutional use of force could certainly be held personally responsible under section 1983 or *Bivens* to a person shot by an officer following the policy.

The allegations in this complaint are closer to the latter example than to the majority's examples. The plaintiffs may or may not be able to prove their allegations — it now is unlikely they will ever have the chance to try — but they allege that the use of harsh interrogation techniques amounting to torture was the subject of Mr. Rumsfeld's personal attention. Cmplt. ¶¶ 217, 244, 252. They allege that he issued policies or orders contrary to governing U.S. law but authorizing the torture they suffered. ¶ 244. That should be enough to withstand a motion to dismiss under Rule 12(b)(6).

In *Ashcroft v. Iqbal* itself, the Attorney General and the Director of the FBI conceded that they would have been subject to personal liability for actions of their subordinates if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects being of 'high interest' and that they were deliberately indifferent to that discrimination." 556 U.S. 662, 690-91 (2009) (Souter, J., dissenting). We and other circuits have taken that approach as well. See *T.E. v. Grindle*, 599 F.3d 583, 590 (7th Cir. 2010) (affirming denial of summary judgment for school principal who failed to investigate or take action in response to complaints indicating teacher was sexually abusing students); accord, *McCreary v. Parker*, 456 Fed. Appx. 790, 793 (11th Cir. 2012) (affirming denial of qualified immunity where plaintiff alleged sheriff was deliberately indifferent to known dangers resulting from overcrowding policy in jail); *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) (reversing summary judgment grant of qualified immunity for defendant law school dean where evidence indicated that dean was on notice that faculty's negative hiring recommendation was based on plaintiff's political beliefs and associations); *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (reversing dismissal; superior's knowledge of abuse of prisoners combined with inaction allowed inference of deliberate indifference at the pleading stage); *Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) (affirming denial of summary judgment of a claim against county sheriff for adopting policy that would violate detainees' rights). *Iqbal*'s different approach to pleading an individual's *discriminatory* intent does not

address the issue of personal responsibility for an uncon-
stitutional practice or policy asserted here. See *Vance*,
653 F.3d at 599 n.5.

The case is before us on an interlocutory appeal from
the denial of a motion to dismiss under Rule 12(b)(6).
The allegations against Mr. Rumsfeld satisfy the plausi-
bility standard of *Iqbal*, *Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007), and *Erickson v. Pardus*, 551 U.S. 89
(2007). And even if they did not, the plaintiffs should be
allowed to amend their pleadings, especially in view of
the uncertainty of federal pleading standards after *Iqbal*
and the fact that the district court and panel found
their present pleadings sufficient to state plausible
claims. See, *e.g.*, *Bausch v. Stryker Corp.*, 630 F.3d 546, 562
(7th Cir. 2010); *Airborne Beepers & Video, Inc. v. AT&T
Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007). Consider
two possible amendments, for example. After years
of delay, the government finally complied with the
district court's order to identify the individuals who
slammed plaintiffs into walls, deprived them of sleep,
food, water, and adequate clothing, and who subjected
them to extreme cold, though after plaintiffs have been
seeking the needed information in the district court for
nearly six years, the government still has not pro-
vided sufficient information to serve any of those indi-
viduals with process. If this stone-walling finally ended,
plaintiffs could amend their complaint to name at least
some of those individuals. (Whether plaintiffs could
invoke equitable tolling or other doctrines to overcome
a statute of limitations defense based on a concerted
effort to conceal identities of their torturers is a different

question, especially in light of plaintiffs' diligence over nearly six years, and one we should not try to decide now.) Or suppose for purposes of argument that plaintiffs could even produce an order personally signed by Mr. Rumsfeld ordering that these two plaintiffs, in particular, be treated as they allege they were treated. Either amendment should be enough to allow plaintiffs to proceed, but under the majority's erroneous view of military immunity from *Bivens* liability, both amendments would be futile.

## III. *Qualified Immunity*

In *Mitchell v. Forsyth*, the Supreme Court rejected absolute immunity for a former cabinet member who said he had acted to protect national security. Qualified immunity was sufficient: "'Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate . . . .'" 472 U.S. at 524, quoting *Harlow v. Fitzgerald*, 457 U.S. at 819 (emphasis added in *Mitchell*). The panel concluded that plaintiffs had alleged violations of clearly established constitutional law. Even the defendants do not seriously argue that prolonged deprivation of sleep, food, water, and adequate clothing, exposure to extreme cold, and hooded "walling" do not violate clearly established constitutional law. See *Vance*, 653 F.3d at 606-11. On rehearing, defendants have not disagreed with that analysis. (The argument they have labeled "qualified immunity" addresses only whether plaintiffs sufficiently alleged Mr. Rumsfeld's personal responsibility.) The

majority also does not question the substantive constitutional law or qualified immunity, so there is no need for further discussion of those points.

*Conclusion*

Our courts have a long history of providing damages remedies for those whose rights are violated by our government, including our military. In *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178-79 (1804), the Supreme Court held that the commander of a warship was liable to the owner of a neutral vessel seized pursuant to orders from the President but in violation of a statute. See also *Iqbal*, 556 U.S. at 676, citing *Dunlop v. Munroe*, 11 U.S. (7 Cranch) 242, 268 (1812) (in case against postmaster, federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Bivens*, 403 U.S. at 395-97 (collecting cases showing that damages against government officials are historically the remedy for invasion of personal interests in liberty, and quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803): "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.").

The majority's grant of absolute civil immunity to the U.S. military for violations of civilian citizens' constitutional rights departs from that long heritage. We leave citizens legally defenseless to serious abuse or worse by their own government. I recognize that wrongdoers in the military are still subject to criminal prosecution

within the military itself. Relying solely on the military
to police its own treatment of civilians fails to use the gov-
ernment's checks and balances that preserve Ameri-
cans' liberty. The legal foundations for the claims before
us are strong and in keeping with the Supreme Court's
decisions and the best traditions of American liberty
and governance. We should affirm the district court's
decision to allow plaintiffs to try to prove their claims
for torture.

ROVNER, *Circuit Judge*, joined by WILLIAMS and HAMILTON,
*Circuit Judges*, dissenting. I join Judge Hamilton's
dissent and Judge Wood's concurrence in all but Part III.
Judge Wood in her concurrence has rightfully reminded
us that our legal analysis should not rest on "fear that
*Bivens* liability would cause Cabinet Secretaries to carry
out their responsibilities with one eye on their wallets,
rather than for the greater good of their department
and the country." *Ante* at 35. I agree with Judge Wood
that such fear is disrespectful of those who serve in gov-
ernment and dismissive of the protections that such
liability affords against serious and intentional violations
of the Constitution. For this same reason, we cannot allow
fear to cause us to stray from the established federal

pleading standards governing resolution of a motion to dismiss. This case lends credence to the cliched adage that hard facts make bad law.

To survive a motion to dismiss, a complaint need not do more than enunciate a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The plausibility standard is not akin to a "probability requirement." *Twombly*, 550 U.S. at 556. It does not imply that the district court should decide whether the claim is true, which version of the facts to believe, or whether the allegations are persuasive. *See Iqbal*, 556 U.S. at 679; *Richards v. Mitcheff*, No. 11-3227, 2012 WL 3217627, at \*1,\*2 (7th Cir. Aug. 9, 2012); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 538 (7th Cir. 2011); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Provided the complaint invokes a recognized legal theory (and for the reasons expounded upon by Judge Wood and Judge Hamilton, it does), and contains plausible allegations on the material issues, it cannot be dismissed under Rule 12. *Richards*, 2012 WL 3217627, at \*2.

Vance and Ertel have alleged Secretary Rumsfeld's direct participation in their torture. Vance contends, for example, that Secretary Rumsfeld authorized the interrogation tactics utilized on the plaintiffs and that some of these techniques required Secretary Rumsfeld's personal approval on a case-by-case basis thus inferring that Secretary Rumsfeld must have authorized the torturous interrogation himself. (R.116, p.44, ¶ 217). These claims may not be true, and if they are, the plain-

tiffs may have little chance of providing sufficient evidence to convince a trier-of-fact, but they are nevertheless plausible and contain more than bare legal conclusions. *Twombly* and *Iqbal* require no more.

I fear future appeals of dismissals will be muddied by the court's attempt to refract the Rule 12(b)(6) standard to protect a high level governmental official engaged in a war to protect the citizens and ideals of this country. But even in the most difficult of cases, we must adhere to the federal pleading requirements dictated by Federal Rule of Civil Procedure 12(b)(6) and the precedent of the United States Supreme Court.

WILLIAMS, *Circuit Judge*, joined by ROVNER and HAMILTON, *Circuit Judges*, dissenting. I join Judge Hamilton's and Judge Rovner's dissenting opinions in full, as well as Judge Wood's concurrence in all but Part III. I write separately to voice my own concerns with the majority decision.

Applying *Bivens* to (even arguably) novel factual scenarios has always required a delicate balance of competing considerations. But in the effort to wall off high officials' bank accounts, the majority appears to have erected a sweeping, unprecedented exemption from

*Bivens* for military officers. No case from our highest court or our sister circuits has approached such a sweeping conclusion. The vagueness of the majority's analysis makes the actual scope of the exemption unclear. Does the new immunity apply only to the highest officials in the chain of command? To suits brought by security contractors in a conflict zone? As for the doctrine of *Bivens* itself, the majority's reservations about this constitutional bulwark are transparent. That should not matter. "The Supreme Court alone is entitled to declare one of its decisions defunct . . . [e]ven if later decisions wash away the earlier one's foundation . . . ." *United States v. Booker*, 375 F.3d 508, 516 (7th Cir. 2004) (Easterbrook, J., dissenting) (citing *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) and *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). Whatever the status of *Bivens*, this decision sweeps too broadly and vaguely, and so I must dissent.

I.

The majority states that "[w]hat plaintiffs want is an award of damages premised on a view that the military command structure should be different—that, for example, the Secretary of Defense must do more (or do something different) to control misconduct by inter-rogators and other personnel on the scene in foreign nations." Slip op. at 12. The characterization mis-represents the nature of this suit. The plaintiffs are not asking the courts to give Rumsfeld a poor performance evaluation as Secretary of Defense. They are suing him

for personally and intentionally violating their funda-
mental rights as American citizens. Nor does the
complaint seek to alter the "military command structure."
No count requests an injunction or declaratory judg-
ment regarding military discipline, the chain of com-
mand, or the policies employed by Rumsfeld or his sub-
ordinates. *Cf. Lebron v. Rumsfeld*, 670 F.3d 540, 546 (4th
Cir. 2012) (plaintiff principally sought to enjoin his desig-
nation as an enemy combatant, requesting nominal dam-
ages from defendants).

What plaintiffs assert is: (1) they were tortured in
violation of the Constitution and laws of the United States;
(2) Rumsfeld is personally liable because he authorized
their torture and made case-specific determinations
about who would receive "enhanced" treatment after it
was made clear that his detention policies were illegal;
and (3) plaintiffs should receive monetary damages for
the abuse they endured in military custody. Vance and
Ertel do not want to remake military policy through
the judiciary. Frankly, there is little need to do so
because Congress has already directly addressed and
outlawed the detention practices inflicted on these plain-
tiffs. Instead, the allegation before us is willful, directed
non-compliance with the law. The majority may believe
that Rumsfeld's actions were merely negligent and
that may be true. But that is not the allegation.

Having misinterpreted the complaint, the majority
next misreads the Supreme Court's opinions in *Chappell v.
Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley*,
483 U.S. 669 (1987). It is suggested that in these decisions,

"[t]he Supreme Court's principal point was that civilian courts should not interfere with the military chain of command . . . [because] military efficiency depends on a particular command structure, which civilian judges easily could mess up without appreciating what they were doing." Slip op. at 11. Judge Hamilton comprehensively explains why the majority has incorrectly applied the precedent. I would only add that *Stanley* explicitly addressed the scope of the decision, as well as the potential "levels of generality at which one may apply 'special factors' analysis":

> Most narrowly, one might require reason to believe that in the particular case the disciplinary structure of the military would be affected—thus not even excluding all officer-subordinate suits, but allowing, for example, suits for officer conduct so egregious that no responsible officer would feel exposed to suit in the performance of his duties. Somewhat more broadly, one might disallow Bivens actions whenever an officer-subordinate relationship underlies the suit. More broadly still, one might disallow them in the officer-subordinate situation and also beyond that situation when it affirmatively appears that military discipline would be affected. (This seems to be the position urged by Stanley.) Fourth, *as we think appropriate*, one might disallow Bivens actions whenever the injury arises out of activity "incident to service." And finally, one might conceivably disallow them by servicemen entirely.

483 U.S. at 681 (emphasis added). Here, *Stanley* describes its principal point unambiguously: Members of the military cannot invoke *Bivens* for injuries arising out of "activity incident to service." Indeed, the Court *reserved* the possibility of *Bivens* suits by servicemen against military officials in other contexts. Despite *Stanley*'s clarity, the majority contends that the Supreme Court actually meant to bar *any* suit, even by civilians, that "interfere[s] with the military chain of command." I cannot tell what this purported standard means. But it goes well beyond what the Supreme Court has expressly identified as a bridge too far. Can there be a clearer indication of error?

At heart, in *Chappell* and *Stanley*, the Supreme Court did not want to permit service members to litigate what are effectively employment disputes against superiors through the federal courts rather than through the military's internal channels. *See Chappell*, 462 U.S. at 303-05 (barring race discrimination claim). That rationale does not apply here.[1] *Cf. id.* at 300 ("Civilian courts must . . .

---

[1] The majority entertains the idea that the plaintiffs, as security contractors, might be considered equivalent to soldiers anyway when evaluating the availability of a *Bivens* action. But this is a distraction. The individuals in *United States v. Brehm*, 691 F.3d 547 (4th Cir. 2012) and *United States v. Ali*, 2012 CAAF LEXIS 815 (C.A.A.F. July 18, 2012) were effectively employees of the United States military, subcontracted through American companies. Notably, this was the same scenario in *Doe v. Rumsfeld*, 683 F.3d 390, 392 (D.C. Cir. 2012), where the court

(continued...)

hesitate long before entertaining a suit which asks the court to *tamper with the established relationship between enlisted military personnel and their superior officers*; *that relationship* is at the heart of the necessarily unique structure of the military establishment." (emphasis added)). This court's decision leaves unexplained how or why a suit by an American civilian, with no connection to the chain of command, would interfere with military discipline in the manner anticipated by *Chappell* and *Stanley*.[2]

---

(...continued)

treated a defense contractor employee as equivalent to a serviceman because he was working for the United States military. This case is different. When Vance and Ertel were detained and tortured, they worked for Shield Group Security, an Iraqi corporation which provided security contracts to the government of Iraq and private companies. The plaintiffs do not appear to have had a connection to the United States government beyond being American citizens. At very least, a reading of the complaint in the light favorable to plaintiffs cannot support an employment relationship with the United States military. The majority further suggests that security contractors are inherently similar to soldiers. Perhaps this is true in the sense that a mall guard is like a homicide detective. But Vance and Ertel's job descriptions have no bearing on the availability of *Bivens* in this case.

[2] As Judge Hamilton notes, the majority altogether ignores the Supreme Court's contradictory analysis in *Saucier v. Katz*, 533 U.S. 194 (2001), which treated a civilian's excessive force suit against a military officer as permissible (though barred in

(continued...)

Even if judicial participation might interfere in some other way, there is a further irony underlying the majority's approach. The opinion recognizes that injunctive relief against illegal military conduct is already available under established doctrine. *See* slip op. at 17 ("Injunctions that enforce the Detainee Treatment Act prospectively may be possible under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), or the waiver of sovereign immunity in 5 U.S.C. §702."). This point was also raised at oral argument where the parties agreed that the judiciary retains the power to enjoin an unconstitutional practice or unlawful deprivation of rights. Do such suits "interfere" with the military command structure or the chain of command? They certainly would seem to. So, to the extent that the majority fears judicial scrutiny of military policy, that state of affairs is already upon us and is sanctioned by this decision itself.

The Supreme Court requires us to exercise judicial review in various circumstances impacting national security. *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) ("[A] state of war is not a blank check for the President when it comes to the rights of the Nation's citizens. . . . Whatever power the United States Constitution envisions for the Executive in its exchanges

---

(...continued)

that case by qualified immunity). *Saucier* was decided well after *Stanley* and *Chappell*. If the Supreme Court had been concerned all along with the threat posed by civilian suits to the chain of command, why didn't it say so?

with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."); *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985) ("[D]espite our recognition of the importance of [the Attorney General's activities in the name of national security] to the safety of our Nation and its democratic system of government, we cannot accept the notion that restraints are completely unnecessary."); *Baker v. Carr*, 369 U.S. 186, 211 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("[E]ven the war power does not remove constitutional limitations safeguarding essential liberties."). Executive power to protect national security or conduct foreign affairs does not deprive the judiciary of its authority to check abuses that violate individual rights. Judicial review may be deferential to the interests of national security, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, 26 (2008), but it remains necessary. Habeas corpus review certainly interferes with the military's assessment of national security priorities. No matter. Our constitutional system requires the judiciary's participation. *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ("[T]he political branches [do not] have the power to switch the Constitution on or off at will . . . .").

I do not mean that actions for money damages must be treated identically to actions for prospective relief. The remedies are distinct. But this puts into sharp perspective the majority's implication that there is

a categorical ban on "judicial intrusion into military affairs." The judiciary is already intertwined in the constitutional review of military determinations. It is inconsistent to consider federal courts competent on the one hand to balance policy concerns associated with injunctive relief (as the majority must concede), while treating these courts as unqualified to address actual injury to citizens caused by official abuse. Traditionally, damages actions have been viewed as *less* intrusive than injunctive relief because they do not require the court to engage in operational decision-making. *Compare Gilligan v. Morgan*, 413 U.S. 1, 11 (1973) (rejecting a suit seeking judicial supervision of the operation and training of the Ohio National Guard in the wake of the Kent State shootings) with *id.* at 5 (suggesting that a damages action against the National Guard could be justiciable) and *Scheuer v. Rhodes*, 416 U.S. 232, 247-49 (1974) (permitting such a suit). True, courts make mistakes, but this has little to do with the propriety of *Bivens*. Every government institution errs, including the military. The point of judicial participation is not infallibility but independence and neutrality, something executive entities do not have when evaluating their own officers' conduct.

For these reasons, I cannot accept the majority's rationale for rejecting *Bivens* in this context. The majority pins much of its reasoning on the *Lebron* decision but does not mention any of the relevant details. The *Lebron* suit was brought on behalf of Jose Padilla, an individual designated as an enemy combatant by the President and later convicted of criminal terrorism charges. Padilla's proposed *Bivens* action sought a

judicial declaration that his designation as an enemy combatant and resulting detention were unconstitutional. The *Lebron* court rejected the claim on separation-of-powers grounds reasoning that in identifying terrorists, the President acted with express congressional approval under the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001).

Whatever the merits of *Lebron*, it is disingenuous to suggest that the same analysis applies in this case. The majority endeavors to stretch a blanket of immunity over the entire "military chain of command" in an effort to cover the very different facts presented here. Vance and Ertel do not challenge their status and detention as enemy combatants; they could not do so because they never received such a designation. And far from authorizing their treatment, Congress and the President acted twice to outlaw it through the National Defense Authorization Act and the Detainee Treatment Act ("DTA"). 10 U.S.C. §801 note. The complaint charges the defendant with intentionally acting *in derogation of* the newly enacted laws to retain and administer illegal interrogation practices, approving them on an individualized basis. These allegations may not be true. But if they are true, I cannot agree that the separation of powers bars a citizen's recovery from a rogue officer affirmatively acting to subvert the law. That is a quintessential scenario where *Bivens* should function to enforce individual rights.

Every member of this court recognizes that the job of the military is challenging, dangerous, and critical to

our national security. For these reasons and more, members of the armed forces enjoy unparalleled respect in our society. But this respect does not put the military's highest officers beyond the reach of the Constitution or adjudication by Article III courts. We would abdicate our duty if we permit *Bivens* to become a mirage. If it is an illusion, it is a dangerous one because it has tricked not only plaintiffs, but the other branches of our government into relying upon it. Congress created in the DTA a limited, good-faith defense against *Bivens* meant to be available in situations precisely like this one. And the State Department pointed to *Bivens* suits as evidence that we take seriously our commitments to preventing torture. The majority suggests that the other branches of government were only leaping at shadows. But we have an independent obligation to individual citizens and to the Constitution to apply the precedent even in difficult cases. Otherwise we risk creating a doctrine of constitutional triviality where private actions are permitted only if they cannot possibly offend anyone anywhere. That approach undermines our essential constitutional protections in the circumstances when they are often most necessary. It is no basis for a rule of law.

## II.

Whether the plaintiffs have adequately pled Rumsfeld's personal liability for violations of clearly established law is also a delicate question. Arguably qualified immunity should shoulder more of the burden of the major-

ity's demonstrable hesitation to hold high government officials accountable for constitutional violations. *Cf. Padilla v. Yoo*, 678 F.3d 748, 768 (9th Cir. 2012) (disposing of suit on qualified immunity grounds rather than affording total immunity to *Bivens*). Nevertheless, I agree with my dissenting colleagues that the plaintiffs' complaint should survive. This complaint is unusually detailed and alleges Rumsfeld's personal participation in interrogation determinations, something the majority ignores. It is plausible (if not necessarily probable) to infer from Rumsfeld's direct involvement in developing interrogation practices at Camp Cropper and his case-specific approval of techniques used on detainees that he personally authorized the plaintiffs' abuse or remained intentionally indifferent to it. These allegations go well beyond those deemed insufficient in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and present more than a mere possibility of liability. Therefore, I would permit the suit to continue to at least limited discovery. *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 593 n.14 (1998).

I respectfully dissent.